UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER RYAN VASQUEZ, | No. 2:14-cv-01874-AC |
| Plaintiff, | |
| v. | ORDER |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act. Plaintiff's motion for summary judgment and the Commissioner's cross-motion for summary judgment are pending. For the reasons discussed below, the court will grant plaintiff's motion for summary judgment and deny the Commissioner's cross-motion for summary judgment.

PROCEDURAL BACKGROUND

Plaintiff filed his application for SSI on December 30, 2011. Administrative Record ("AR") 19. Plaintiff's application was denied initially on April 6, 2012, and again upon reconsideration on June 20, 2012. Id. On January 16, 2013, a hearing was held before administrative law judge ("ALJ") William C. Thompson, Jr. AR 19, 26. Plaintiff appeared with

his attorney at the hearing, where he and his aunt, Athena Guerrero, testified. AR 19, 31. In a decision dated March 14, 2013, the ALJ found plaintiff not disabled. AR 26.

The ALJ made the following findings:

> 1. The claimant has not engaged in substantial gainful activity since December 30, 2011, the application date.
>
> 2. The claimant has the following severe impairments: psychosis not otherwise specified reclassified as undifferentiated schizophrenia and history of substance abuse in remission.
>
> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.
>
> 4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) with the ability to perform unskilled work involving simple instructions with occasional contact with the public and with coworkers.
>
> 5. The claimant has no past relevant work.
>
> 6. The claimant was born on August 16, 1983 and was 28 years old, which is defined as a "younger individual age 18-49," on the date the application was filed.
>
> 7. The claimant has at least a high school education and is able to communicate in English.
>
> 8. Transferability of job skills is not an issue because the claimant does not have past relevant work.
>
> 9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.
>
> 10. The claimant has not been under a disability, as defined in the Social Security Act, since December 30, 2011, the date the application was filed.

AR 19–26 (citations to the Code of Federal Regulations omitted).

Plaintiff requested review of the ALJ's decision by the Appeals Council, but it denied review on July 10, 2014, leaving the ALJ's decision as the final decision of the Commissioner of Social Security. AR 1–4.

///

FACTUAL BACKGROUND

Born on August 16, 1983, plaintiff was 28 years old on the date his SSI application was submitted and 29 years old at the time of his administrative hearing. AR 19, 25. Plaintiff has never engaged in substantial gainful activity. AR 16.

LEGAL STANDARDS

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied. Schneider v. Comm'r of the Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000); Morgan v. Comm'r of the Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999); Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).

The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive. See Miller v. Heckler, 770 F.2d 845, 847 (9th Cir. 1985). Substantial evidence is more than a mere scintilla, but less than a preponderance. Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). "It means such evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). "While inferences from the record can constitute substantial evidence, only those 'reasonably drawn from the record' will suffice." Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006) (citation omitted). Although this court cannot substitute its discretion for that of the Commissioner, the court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion." Desrosiers v. Sec'y of Health and Hum. Servs., 846 F.2d 573, 576 (9th Cir. 1988); see also Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). However, the court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not

3

1 rely." Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007); see also Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003). In addition, "[t]he ALJ in a social security case has an independent ''duty to fully and fairly develop the record and to assure that the claimant's interests are considered.''" Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).

The court will not reverse the Commissioner's decision if it is based on harmless error, which exists only when it is "clear from the record that an ALJ's error was 'inconsequential to the ultimate nondisability determination.'" Robbins v. Soc. Sec. Admin., 466 F.3d 880, 885 (9th Cir. 2006) (quoting Stout v. Comm'r, 454 F.3d 1050, 1055 (9th Cir. 2006)); see also Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

## ANALYSIS

Plaintiff seeks summary judgment on the grounds that (1) the ALJ erred by failing to articulate specific and legitimate reasons supported by substantial evidence for rejecting the opinion of Dr. Les Kalman, M.D.; (2) the ALJ erred by failing to provide a proper rationale for discounting plaintiff's testimony; (3) the ALJ failed to properly consider the lay evidence; and (4) the ALJ erred in finding that there is other work in the national economy that plaintiff could perform. The Commissioner, in turn, argues that the ALJ's findings are supported by substantial evidence and are free from legal error. For the reasons discussed below the court finds that the ALJ erred by (1) failing to articulate specific, legitimate reasons for dismissing Dr. Kalman's medical opinion; (2) determining plaintiff's testimony was not credible without clear and convincing reasons; and (3) discounting the lay evidence without articulating specific reasons supported by the evidence. For the foregoing reasons the court will grant plaintiff's motion for summary judgment and remand for further consideration consistent with this opinion.

A.  Medical Expert Testimony

  1.  Legal Standards

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine [d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (nonexamining physicians)." Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). In general, the

4

opinion of a treating doctor is accorded more weight than the opinion of a doctor who did not treat the claimant, and the opinion of an examining doctor is, in turn, entitled to greater weight than the opinion of a nonexamining doctor. Id. (citations omitted); 20 C.F.R. § 404.1527(c)(1)(2).

An ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of a treating or examining physician. Lester, 81 F.3d at 830 (citing Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990)). If contradicted by another doctor, the opinion of a treating or examining physician can be rejected only for "specific and legitimate reasons" that are supported by substantial evidence in the record. Id. at 830–31 (citation and internal quotation marks omitted). "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." Lester, 81 F.3d at 831. An ALJ, however, "need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas, 278 F.3d at 957.

    2.    Medical History

Medical records indicate that plaintiff's first doctor's visit was to the ER for an infection and open sores on his penis on January 9, 2009. AR 266–67. At that time, plaintiff stated a foreign body was embedded under the skin and had been there for approximately two years, although he stated he did not know how it had gotten there. Id. Doctors suspected plaintiff might suffer from schizophrenia at the time but there had not yet been a formal diagnosis. Id. On March 20, 2009, plaintiff underwent surgery to remove the foreign body. AR 269. During the surgery, doctors excised a fishing line. Id. When questioned about how the fishing line could have gotten beneath the skin, plaintiff asserted that the surgeons had placed it there. AR 272. However, according to the testimony of plaintiff's aunt at the hearing before the ALJ, plaintiff had been in the habit of tying things around his fingers and placing things on his ears at that time. AR 52–54. Plaintiff also had a long history of inserting other foreign objects into his body. Id. Based on these facts, plaintiff's aunt surmised that plaintiff had tied the fishing line around his own penis and left it there until it began irritating him. Id.

1       Plaintiff then visited Dr. Kandace Atkins, M.D., at San Joaquin County Mental Health
Services ("Mental Health Services") on May 12, 2009.  AR 216.  Plaintiff's grandmother,
Elizabeth Webster, accompanied him to visit Dr. Atkins, and explained plaintiff's behavior.  Id.
Plaintiff stated that everything was fine, and denied having any mental illness during his doctor's
visit.  Id.  However, Ms. Webster stated that plaintiff had recently been yelling at people who
were not there.  Id.  Dr. Atkins noted that plaintiff did not seem to be grooming himself or taking
care of his hygiene, and was generally guarded and irritable.  Id.  Dr. Atkins also noted that
plaintiff had a history of methamphetamine use from age 16 to 22.  Id.  Plaintiff had come to
crisis earlier and been prescribed Abilify, which Ms. Webster stated was helping.  Id.  Plaintiff's
mood was dysthymic and he answered "I don't know" to most questions.  Id.  Dr. Atkins
prescribed plaintiff Risperdal and Cogentin.  Id.

      During a follow up visit with Dr. Atkins, she noted plaintiff exhibited poverty of speech,
poor eye contact, and that his hair was not washed.  AR 218.  Plaintiff was no longer yelling, and
was sleeping 8 to 10 hours a night.  Id.  Accordingly, Dr. Atkins decreased plaintiff's prescription
of Cogentin and changed his Risperdal prescription.  Id.  On January 7, 2010, plaintiff visited
Mental Health Services and was seen by a registered nurse, Angelo Pasa, because the doctor was
out at the time.  AR 220.  Mr. Pasa noted that plaintiff asked to have his prescription "upgraded"
so he could concentrate on his studies.  Id.  Otherwise, plaintiff had adequate hygiene and
disheveled hair, was cooperative and seemed to have clear, goal oriented thoughts with adequate
insight into his illness.  Id.  Mr. Pasa then discussed plaintiff's case with the doctor on staff, Dr.
Edwin Kroon, M.D., who re-ordered his medications.  AR 219–20.

      Plaintiff had a follow-up visit with Dr. Atkins on April 29, 2010.  AR 221.  Ms. Webster
did most of the talking during the visit, explaining that plaintiff was approaching finals at Delta
College, which he attends four days a week.  Id.  Ms. Atkins stated this was likely making
plaintiff increasingly anxious, but that Ms. Webster also may have been too insistent when it
came to plaintiff doing his coursework.  Id.  Dr. Atkins diagnosed plaintiff as suffering from
undifferentiated schizophrenia at this time, and made no changes in his prescription.  Id.
Plaintiff's next doctor's visit was on July 29, 2010.  AR 222.  During that visit plaintiff was much

1  more engaged in his conversation with Dr. Atkins, looking her in the eye during the entire
2  interview.  Id.  Dr. Atkins noted that plaintiff might feel too much pressure to succeed, and
3  suggested that he see a school counselor about his issues to, perhaps, get more time on
4  assignments or a room with less stimulation to take tests.  Id.  Plaintiff discussed his former
5  delusion that the military was pressuring him to join "every two seconds."  Id.  Dr. Atkins
6  reminded him that he was not on meds at the time that he was having those delusions, but noted
7  she was not sure whether he fully realized it was a delusion yet.  Id.  In light of plaintiff's
8  substantial progress, Dr. Atkins prescribed no changes in his medication.  Id.

9    On October 20, 2010, plaintiff had a follow up visit with Dr. Atkins.  AR 224.  Dr. Atkins
10 interviewed plaintiff alone in light of his improved eye contact and willingness to converse, and
11 found him to be very paranoid.  Id.  Plaintiff was upset that he was not doing well in school, and
12 seemed to believe everyone was plotting against him.  Id.  When Dr. Atkins brought Ms. Webster
13 back in she mentioned that plaintiff had previously accused her of poisoning her food at one time.
14 Id.  Dr. Atkins explained to plaintiff at that time that a full course load would not be possible for
15 him, but that he may be able to take one or two courses at a time.  Id.  Dr. Atkins also increased
16 his Risperdal and Cogentin prescription in light of his heightened paranoia.  Id.

17   Plaintiff's next doctor's visit was with Dr. Gerardo Manansala, M.D. at Mental Health
18 Services on February 9, 2011.  AR 226.  During that visit plaintiff stated that he continued to hear
19 voices, specifically the voice of an ex-girlfriend stating "pick up your boxes."  Id.  However,
20 plaintiff stated that medication had quieted the voices somewhat.  Id.  Plaintiff's mother told Dr.
21 Manansala that he was independent with his personal hygiene and grooming, and was compliant
22 with his medications.  Id.  Dr. Manansala noted that plaintiff seemed to have adequate hygiene
23 and grooming, maintained eye contact, and spoke coherently.  Id.  Dr. Manansala decreased
24 plaintiff's prescription of Cogentin and continued his prescription of Risperdal.  Id.  Two days
25 later, plaintiff sought vocational assistance from Mental Health Services and was referred to
26 Career Center Staff.  AR 228.

27   Plaintiff's next appointment was with Dr. Irina Schwartz, M.D., at Mental Health Services
28 on May 4, 2011.  AR 229.  Plaintiff reported feeling well, and stated he slept well and had a good

appetite. Id. Ms. Webster stated that plaintiff had become paranoid two months ago, but that he returned to normal after approximately two weeks. Id. Dr. Schawrtz noted that plaintiff had good eye contact, seemed to be appropriately groomed, and denied having any auditory or visual hallucinations. Id. In light of plaintiff's stable condition Dr. Schwartz instructed him to continue his medications as prescribed. Id.

Plaintiff next appointment at Mental Health Services was with a registered nurse, Ramil Doronio, on July 27, 2011. AR 232. During that visit plaintiff reported he was doing well and was not suffering any side effects of his medications. Id. Ms. Webster reported a substantial improvement in his behavior with medication. Id. Specifically, Ms. Webster reported that plaintiff cleaned up around the house, studied for classes, and intended to take classes to join law enforcement. Id. Ms. Webster also reported, however, that plaintiff would smile or laugh for no apparent reason at times, although he denied having audio or visual hallucinations. Id. Mr. Doronio noted that plaintiff was adequately groomed, however his breath smelled of alcohol and his speech was "tangential" at times. Id. Based on his observations Mr. Doronio recommended that plaintiff continue with his medication regimen. Id. That recommendation was affirmed by Dr. Nagamani Padala, M.D. AR 231.

Medical records reflect four more visits to Mental Health Services on October 31, 2011; January 11, 2012; August 15, 2012; and December 5, 2012. AR 305, 298, 296, 294. Each of those visits was with Dr. Suryabamu Javeed, M.D. Id. Dr. Javeed's records from plaintiff's visits are nearly identical. For example, records from all four visits state that plaintiff: was neatly groomed; was in a euthymic mood; had a neutral affect; spoke in a low tone when responding to questions; and was alert and oriented as to time, place, and person. Id. However, small differences do stand out. During plaintiff's third visit he stated that he was taking classes in swimming, weight lifting, and psychology at Delta College, and ultimately wanted to work in the health field. AR 296. Dr. Javeed also noted that Ms. Webster did most of the talking, and that plaintiff was "quite evasive and is an unreliable informant." Id. During plaintiff's last visit, Dr. Javeed signed a form from Delta College with plaintiff's consent turning over certain medical

////

8

records. AR 294. During that same visit plaintiff expressed a desire to enrolling in nurse assistant training (CNA) courses by March 2013. Id.

Plaintiff's initial disability determination explanation was authored by Dr. M. O. Mallare, M.D., on March 28, 2012. AR 65–74. Dr. Mallare, a nonexamining physician, reviewed medical records from Mental Health Services dated September 2009 to January 2012. AR 67–68. Based on a detailed review of plaintiff's medical reports Dr. Mallare noted plaintiff's diagnoses of schizophrenia and substance addiction, both of which he rated "severe." AR 69. Nevertheless, Dr. Mallare stated that a residual functional capacity assessment was necessary. AR 70. Dr. Mallare opined that plaintiff was moderately limited in his ability to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule and maintain regular attendance within customary tolerances; work with others without being distracted by them; complete a normal workday without interruptions from psychologically based symptoms and perform without unreasonably frequent and long rest periods; interact appropriately with the general public; and respond appropriately to changes in the work setting. AR 71–72. Based on these findings Dr. Mallare opined that plaintiff was capable of semi-skilled work and, accordingly, was not disabled. AR 73–74. On reconsideration, plaintiff's claim was evaluated by S. Jacobson, M.D. AR 76–85. Dr. Jacobson reviewed the initial evidence as well as medical reports from January and April 2012. AR 78. The remainder of Dr. Jacobson's determination mirrors Dr. Mallare's. AR 81–84.

On January 18, 2013, plaintiff was examined by Dr. Kalman. AR 338–46. Dr. Kalman completed a medical source statement based on his own psychiatric evaluation and the aforementioned medical records. Id. Dr. Kalman noted that plaintiff admitted to hearing voices, stating that "every time I mention firemen it says nope. It feels like there is a gang messing with me. Since middle school they jumped me." AR 338. Although plaintiff attempted to minimize his disorder, plaintiff's aunt commented that he has a short attention span, paces frequently, and exhibits other bizarre behavior. AR 338–39. Plaintiff's aunt also noted that plaintiff has to urinate frequently but there does not seem to be any medical cause for that condition. AR 339. Dr. Kalman noted that plaintiff was attending Delta College at the time, and that stress from

school sometimes exacerbated his auditory hallucinations. AR 339. On the topic of intellectual functioning, Dr. Kalman noted the results of a number of questions. Those notes included the following: "He did not know the date;" "He recalled none of three objects at five minutes;" "He was able to repeat five digits forward and three backward;" "He could do serial 3's with one error;" and others. AR 338–40. When asked to interpret the proverb "you can't judge a book by its cover," plaintiff responded "if you were reading somebody, you can't judge them." AR 340. However, plaintiff also stated that if he found a stamped envelope on the ground he would put it in a mailbox, and if he was in the first person in a theater to see a fire he would call security. Id.

Dr. Kalman also reported that plaintiff's mood was neutral, his affect was blunted and shallow, and his form of thought was tangential. Id. Plaintiff reported doing his own shopping and cooking, and could take care of his own hygiene. Id. Dr. Kalman also opined that plaintiff could attend to his own transportation needs, but only to a limited extent. Id. Dr. Kalman diagnosed plaintiff with a GAF score of 45. AR 341.

Dr. Kalman's medical source statement opined that plaintiff was extremely limited in his ability to understand and remember detailed (3 or more steps) instructions or tasks. AR 343–45. Further, Dr. Kalman opined that plaintiff was markedly limited in his ability to: complete a normal workday without interruptions from psychologically based symptoms or an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Id. Dr. Kalman opined that plaintiff was moderately limited in his ability to: maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; work in proximity with or coordination with others; interact appropriately with the general public; travel to unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. Id. Finally, Dr. Kalman opined that plaintiff was only mildly limited in his ability to: carry out short and simply instructions or tasks; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; make simple work related decisions; ask simple questions or ask for assistance from
////

supervisors; maintain socially appropriate behavior; and respond appropriately to expected or unexpected changes in the work setting. Id.

Dr. Kalman was the only examining physician to provide a medical opinion. No treating physician provided an opinion.

3. Analysis

The court finds that the ALJ committed legal error by failing to articulate specific and legitimate reasons for affording Dr. Kalman's medical opinion little weight.

Finding that Dr. Kalman's medical opinion was not supported by the medical evidence, the ALJ stated the following:

> As for the opinion evidence, the claimant saw Les P. Kalman, M.D. for a one-time psychiatric evaluation in January 2013. The doctor opined that the claimant was extremely limited in the area understanding and remembering detailed instructions or tasks that may not be repetitive. He was markedly limited in the following abilities: carry out detailed tasks, complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number of rest periods, accept instructions and respond appropriately to criticism from supervisors, or get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Dr. Kalman further opined that the claimant would likely be absent from work because of his mental impairment and/or care for 5 or more days per month and would be unable to complete an 8-hour workday 5 or more days per month (Exhibit 9F). I give little weight to Dr. Kalman's opinion. First, although Dr. Kalman was in possession of the claimant's treating records (Exhibit 9F/6), he apparently did not review them. If he had, he would have seen what is reported above: The claimant has moderate GAF scores, little to no complaint of symptoms or distress, and unremarkable mental status examinations. Second, the assessment appears to be based on the claimant's and his aunt's subjective allegations, not the objective evidence of record. Third, this doctor is not a treating physician and examined the claimant on only one occasion. Finally, the objective evidence does not support the level of severity that this doctor assigns. The record and the claimant's testimony show improvement and stability on medications.

AR 24–25. The court will address the ALJ's reasons for affording Dr. Kalman's opinion little weight in turn.

////

////

i. <u>Dr. Kalman's Opinion Versus the Medical Evidence</u>

The ALJ asserts that Dr. Kalman's opinion differs so dramatically from plaintiff's treating records that it is questionable whether he actually reviewed them.[1] In other words, the ALJ asserts that Dr. Kalman's opinion is not supported by the medical evidence. In considering how Dr. Kalman's opinion compares to plaintiff's previous medical reports, the following paragraph from the Ninth Circuit's opinion in <u>Garrison v. Colvin</u> is instructive:

> As we have emphasized while discussing mental health issues, it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment. Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working. <u>See, e.g.</u>, <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1205 (9th Cir. 2001) ("[The treating physician's] statements must be read in context of the overall diagnostic picture he draws. That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace."). Reports of "improvement" in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and the nature of her symptoms. <u>See Ryan</u>, 528 F.3d at 1200–01 ("Nor are the references in [a doctor's] notes that Ryan's anxiety and depression were 'improving' sufficient to undermine the repeated diagnosis of those conditions, or [another doctor's] more detailed report."). They must also be interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace. <u>See, e.g.</u>, <u>Hutsell</u>, 259 F.3d at 712 ("We also believe that the Commissioner erroneously relied too heavily on indications in the medical record that Hutsell was 'doing well,' because doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity."). Caution in making such an inference is especially appropriate when no doctor or other medical expert has opined, on the basis of a full review of all relevant records, that a mental health patient is capable of working or is prepared to return to work. <u>Cf. Rodriguez v. Bowen</u>, 876 F.2d 759, 763 (9th Cir. 1989) ("The ALJ's conclusion that Rodriguez was responding to treatment also does not provide a clear and convincing reason for disregarding Dr. Pettinger's opinion. No physician opined that any improvement would allow Rodriguez to return to work.").

---

[1] Dr. Kalman's report states that he reviewed unspecified mental health records related to plaintiff's previous diagnoses of psychosis, not otherwise specified; amphetamine dependence, in remission; and schizophrenia, undifferentiated type. AR 338.

12

1   759 F.3d 995, 1017–18 (9th Cir. 2014).

2   The ALJ's summary shows plaintiff's mental condition improved over time with the help
3   of medication, but that improvement does not necessarily contradict Dr. Kalman's opinion. The
4   Commissioner's motion for summary judgment points to the following supposed contradictions:
5   (1) plaintiff had not suffered from auditory or visual hallucinations at least since July 29, 2010;
6   (2) Dr. Kalman's assessment differed from the assessments of state agency examiners; (3)
7   plaintiff's medical records consistently reflect "unremarkable mental problems;" and (4) plaintiff
8   visited Mental Health Services only once every three to four months and was never hospitalized.
9   ECF No. 20 at 18–19.

10   First, the Commissioner's assertion that plaintiff had not suffered from auditory or visual
11   hallucinations since at least July 29, 2010, is not supported by the medical evidence. A medical
12   report authored by Dr. Atkins on October 20, 2010, notes that plaintiff had recently accused his
13   grandmother of poisoning his food, and was generally paranoid. AR 224. In addition, during a
14   February 9, 2011, visit with Dr. Manansala plaintiff stated that while his medication had quieted
15   his voices he still heard them. AR 226. Specifically, plaintiff stated that he heard the voice of an
16   ex-girlfriend telling him to "pick up your boxes." Id. Finally, during a doctor's visit on July 27,
17   2011, Ms. Webster stated that while plaintiff's medication did seem to be improving his
18   symptoms dramatically, he would sometimes laugh and smile for seemingly no reason. AR 232.
19   It is true that medical reports between October 31, 2011, and December 5, 2012, do not mention
20   any hallucinations. AR 305, 298, 296, 294. However, concluding from this fact that Dr.
21   Kalman's opinion is unsupported by the medical evidence is a bridge too far. As the Ninth
22   Circuit has repeatedly emphasized, mental health issues often appear in episodes, and it is legal
23   error to rely upon a limited time period reflecting improvement in a claimant's mental health to
24   discount the opinion of a treating or examining physician. See Garrison, 759 F.3d at 1017. In
25   addition, Dr. Kalman's opinion was formed with an eye to plaintiff's ability to function
26   effectively in the workplace. It should not be surprising, therefore, that his observations differed
27   somewhat from those of doctors assessing him under conditions with limited environmental
28   stressors. See id. (citing Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001)). Accordingly,

13

1   the court finds that Dr. Kalman's opinion is not contradicted by evidence plaintiff did not report
2   any hallucinations to his doctors from October 2011 to December 2012.
3         Second, although the Commissioner is correct that Dr. Mallare's and Dr. Jacobson's
4   assessments differ from Dr. Kalman's, their conclusions do not constitute substantial evidence
5   because they did not examine plaintiff.  See Lester, 81 F.3d at 831 ("The opinion of a
6   nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection
7   of the opinion of either an examining physician *or* a treating physician.")
8         Third, it is unclear what either the ALJ or the Commissioner mean when they assert that
9   plaintiff's doctor's visits were generally "unremarkable."  Certainly, such a blanket assertion
10  coupled with citations to isolated statements reflecting improvement is insufficient to show Dr.
11  Kalman's opinion is not supported by the medical evidence.  See Garrison, 759 F.3d at 1017
12  (citing Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1200-01 (9th Cir. 2008)).  Finally, the fact
13  that plaintiff visited Mental Health Services every three to four months, was stable on his
14  medications, and was never hospitalized does not contradict Dr. Kalman's opinion.  While it is
15  generally true that a conservative treatment regimen can be a specific and legitimate reason for
16  discounting a physician's opinion, the court does not find plaintiff's treatment regimen to be
17  "conservative."  Plaintiff was regularly prescribed anti-psychotics to treat his schizophrenia, and
18  while they did improve his functioning dramatically, it is clear that he still exhibited symptoms.
19  See AR 224, 226, 232.  The ALJ's conclusion that plaintiff's treatment was conservative because
20  he was not recently hospitalized and his prescriptions were not recently increased imposes
21  standards that are unsupported by either the regulations or Ninth Circuit precedent.
22        ii.    Plaintiff and His Family's Subjective Allegations
23        The ALJ claims that Dr. Kalman's opinion is entitled to less weight because it is based on
24  plaintiff's and his family's subjective allegations and not the evidence of record.  Again, this
25  seems to be an assertion that Dr. Kalman's opinion is contradicted by the medical evidence
26  which, as the court has already explained, is not readily apparent.  What's more, Dr. Kalman's
27  psychiatric evaluation includes more than a retelling of plaintiff's symptoms by him and his
28  family.  Dr. Kalman specifically noted that plaintiff was a "poor historian" who "tried to

1    downplay" his symptoms, AR 338, which indicates that the doctor did not take plaintiff's self-
2    report at face value. In addition to family members' reports regarding plaintiff's history and
3    functioning, Dr. Kalman relied on his own thorough clinical evaluation of plaintiff's mental
4    status, affective status, and intellectual functioning. AR 338–40. Accordingly, the court finds
5    that Dr. Kalman's opinion does not rely solely upon the subjective statements of plaintiff and his
6    family.

    iii. Dr. Kalman's Status as an Examining Physician and the Medical Evidence

8      The ALJ also notes that Dr. Kalman was not his treating physician, and again claims that
9    his opinion is not supported by the medical evidence. As the court has already explained, the ALJ
10   has not pointed to any medical evidence that contradicts Dr. Kalman's opinion. In addition,
11   although the fact that Dr. Kalman was not plaintiff's treating physician is a reason not to afford
12   his opinion the kind of weight given to a treating physician's opinion, it is obviously not a reason
13   to discount it.

14     For all of the foregoing reasons the court finds that the ALJ did not articulate specific and
15   legitimate reasons supported by substantial evidence for according Dr. Kalman's opinion light
16   weight. The record reflects that plaintiff has received regular outpatient treatment at Mental
17   Health Services. Therefore, in accordance with the ALJ's duty to fully and fairly develop the
18   record, Tonapetyan, 242 F.3d at 1150, the court will grant plaintiff's motion for summary
19   judgment and remand with instructions to obtain a residual functional capacity assessment from
20   plaintiff's treating physician, if possible.

21   B. Credibility Determination

22     1. Legal Standards

23     Once a claimant shows an underlying impairment which may reasonably be expected to
24   produce the pain or other symptoms, and absent any evidence of malingering, the ALJ must
25   provide "clear and convincing" reasons to discredit the claimant's testimony regarding the
26   severity of symptoms.[2] Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007). The ALJ's

---

[2] In a footnote, the Commissioner argues that the "clear and convincing" standard does not apply
(continued…)

credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995) (citing Bunnell v. Sullivan, 947 F.2d 341, 345–46 (9th Cir.1991) (en banc )). The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations. Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ may also employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms. Id.; see also Social Security Ruling ("SSR") 96–7p.[3]

2.   Analysis

The court finds that the ALJ did not give clear and convincing reasons for discounting plaintiff's testimony and will accordingly remand for reconsideration of plaintiff's credibility. The ALJ gave two reasons for doubting plaintiff's credibility: that his testimony was inconsistent with both the medical evidence and his self-described daily activities. AR 22, 24. Regarding the medical evidence, the ALJ pointed to records indicating that plaintiff's condition improved over time, including visits where plaintiff reported no symptoms at all and was described by his doctors as euthymic, with a neutral affect, well oriented and with good judgment and insight. AR 22. Meanwhile, the daily activity that the ALJ believed damaged plaintiff's credibility was regularly attending Delta College, which he asserted requires many of the same attributes as full

---

here. ECF No. 20 at 17 n.4. The Commissioner acknowledges the Ninth Circuit has settled upon a clear and convincing standard where the ALJ has found an underlying impairment and no evidence of malingering. Id. Nevertheless, the Commissioner argues that the Ninth Circuit's standard is contrary to the regulations and Supreme Court precedent. Id. The Commissioner's argument is unconvincing. Neither the regulations nor the Supreme Court case she cites contradict the Ninth Circuit's explicit instructions on this issue. See id. (citing 42 U.S.C. § 405(g); Richardson, 402 U.S. at 401; SSR 96-7p; and 20 C.F.R. § 416.929(a)). In any event, this court is bound by the Ninth Circuit's interpretation of the regulations and of Supreme Court precedent.
[3] "SSRs do not carry the 'force of law,' but they are binding on ALJs nonetheless." Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1224 (9th Cir. 2009). The Ninth Circuit gives them deference so long as they do not produce "a result inconsistent with the statute and regulations." Bunnell v. Sullivan, 947 F.2d 341, 346 n.3 (9th Cir. 1991).

1  time work. AR 23. Because the ALJ made no finding of malingering, these reasons must be

2  clear and convincing.

3        There are a number of problems with the ALJ's credibility determination. First, it is not

4  clear what testimony the ALJ believes is contradicted by plaintiff's daily activities and medical

5  records. The ALJ's opinion includes the following description of plaintiff's testimony:

6
> The claimant, 29 years old, testified that he is unable to work
> because he hears voices and he has been hearing them for years. He
7
> takes Cogentin and Risperdal. The medication helps because it
> lowers the voices. The claimant lives with his grandmother and is
8
> able to take care of his personal hygiene. He takes classes at Delta
> College. The voices tell him he cannot be a firefighter. He
9
> previously had surgery on his right shoulder for a rotator cuff tear.

10

11  AR 22. The ALJ's opinion does not explain what portion of that testimony is called into

12  question. Accordingly, the ALJ erred because his opinion is not specific enough to allow the

13  court to determine why he discredited plaintiff's testimony. See Orteza, 50 F.3d at 750.

14  Even if the ALJ had given a more detailed explanation for his credibility determination, it is

15  unlikely that the factors he cites would support discrediting plaintiff. For example, the ALJ may

16  have believed that plaintiff's testimony exaggerated his symptoms. As the court has already

17  explained however, the fact that plaintiff's medical records do not uniformly contain reports of

18  hallucinations does not mean those symptoms have disappeared entirely. People with mental

19  illness often experience periods of lucidity. Garrison, 759 F.3d at 1017–18. Accordingly, the fact

20  that plaintiff was in a good condition for a series of doctor's visits while taking anti-psychotics is

21  not evidence that his allegations of auditory hallucinations are not credible.

22        In addition, plaintiff's testimony is not necessarily called into question by his class

23  attendance. There is nothing inherently incongruous about plaintiff's alleged symptoms and the

24  fact that he regularly attends class, especially in light of (1) the fact that plaintiff took primarily, if

25  not exclusively, athletics courses; (2) evidence that the stress of school increased the severity of

26  his symptoms; and (3) Delta College was taking steps to accommodate plaintiff's mental

27  impairments. AR 224 (medical report dated October 20, 2010, from Dr. Atkins stating that

28  plaintiff must limit his coursework because the stress of school exacerbates his symptoms), 294

1  (medical report from plaintiff's last visit with Dr. Javeed, stating that Dr. Javeed signed a form
2  from Delta College turning over certain medical records, presumably to obtain special
3  accommodations). The court finds that these facts, without more, do not contradict plaintiff's
4  testimony. See Mongelluzzo v. Colvin, 17 F. Supp. 3d 914, 928 (D. Ariz. 2014) (holding that the
5  claimant's school attendance was not a specific, legitimate reason to discount a treating
6  physician's opinion in light of evidence school increased the severity of her symptoms and the
7  fact that the school was taking steps to accommodate her mental illness). Accordingly, the court
8  will remand for reconsideration of plaintiff's subjective complaints and credibility.
9  C.   Lay Witness Testimony
10     1.   Legal Standards
11  In determining whether a claimant is disabled, an ALJ must consider lay witness
12  testimony concerning a claimant's ability to work. See Dodrill v. Shalala, 12 F.3d 915, 919 (9th
13  Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e). Indeed, "lay testimony as to
14  a claimant's symptoms or how an impairment affects ability to work is competent evidence . . .
15  and therefore cannot be disregarded without comment." Nguyen v. Chater, 100 F.3d 1462, 1467
16  (9th Cir. 1996) (citations omitted). Consequently, "[i]f the ALJ wishes to discount the testimony
17  of lay witnesses, he must give reasons that are germane to each witness." Dodrill, 12 F.3d at 919;
18  see also Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001) ("Lay testimony as to a claimant's
19  symptoms is competent evidence that an ALJ must take into account, unless he or she expressly
20  determines to disregard such testimony and gives reasons germane to each witness for doing so."
21  (citations omitted)).
22     2.   Analysis
23  The court finds that the ALJ did not properly consider lay witness evidence from
24  plaintiff's aunt, Anita Guerrero, and grandmother, Elizabeth Webster. Ms. Guerrero testified at
25  plaintiff's hearing in front of the ALJ, AR 22, 44–56, while Ms. Webster submitted a letter, AR
26  182–87.
27  The court finds first that the ALJ erred because he did not expressly determine to
28  disregard Ms. Guerrero's testimony, nor did he give specific reasons for disregarding her

18

testimony that were supported by the evidence.  The ALJ's opinion describes Ms. Guerrero's testimony in detail, but ultimately says nothing regarding how he considered it.  AR 22.  This, in and of itself, is legal error.  Lewis, 236 F.3d at 511.  Even if the ALJ had explicitly stated he was discounting Ms. Guerrero's testimony, his reasons for doing so would have been insufficient.  The ALJ's summary of Ms. Guerrero's testimony appears right after his summary of plaintiff's testimony.  AR 22.  Accordingly, it is reasonable to surmise that he discounted Ms. Guerrero's testimony for the same reasons that he found plaintiff not to be credible.  However, the medical record and daily activities described by the ALJ do not contradict Ms. Guerrero's testimony any more than they do plaintiff's.

In addition, the ALJ erred by failing to discuss evidence from Ms. Webster.  The ALJ is not required to discuss evidence that is neither significant, nor probative.  Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003).  At the same time however, the ALJ cannot ignore competent lay testimony favorable to the claimant.  Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1056 (9th Cir. 2006); see also Williams v. Astrue, 2010 U.S. Dist. LEXIS 77773, at *4 (C.D. Cal. Aug. 2, 2010) (finding the ALJ erred by neglecting to discuss the report of the claimant's mother because it was both significant and probative).  Plaintiff lives with Ms. Webster, and a reading of her letter reveals that she most likely has more familiarity with his mental state than anyone.  AR 182–87.  Ms. Webster's letter describes plaintiff's drug use, rehabilitation, recent doctor's visits and steady improvement, and finally his remaining difficulties.  Id.  If that were not enough, Ms. Webster is also a former psychiatric nurse.  AR 187.  Such evidence is both significant and probative, especially in the absence of a medical opinion from plaintiff's treating physician.  Accordingly, the court finds that the ALJ erred by neglecting to discuss Ms. Webster's letter.[4]

////

---

[4] In light of the court's finding that the ALJ erred by (1) discounting Dr. Kalman's medical opinion; (2) determining plaintiff was not credible; and (3) neglecting to properly consider the lay evidence it declines to reach plaintiff's argument that the ALJ also failed to sufficiently establish that other jobs exist in the national economy that plaintiff can perform.

D. <u>Remand</u>

Plaintiff requests that the decision of the ALJ be vacated and that the court award plaintiff benefits or, in the alternative, remand for further consideration. The decision whether to remand for further proceedings turns upon the likely utility of such proceedings. <u>Barman v. Apfel</u>, 211 F.3d 1172, 1179 (9th Cir. 2000). In this matter, the court concludes that outstanding issues remain that must be resolved before a determination of disability can be made. Pursuant to this remand, the ALJ shall reconsider (1) Dr. Kalman's medical opinion; (2) the credibility of plaintiff's testimony; and (3) Ms. Guerrero's testimony and Ms. Webster's letter.

## CONCLUSION

In light of the foregoing, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment (ECF No. 16) is granted;

2. The Commissioner's cross-motion for summary judgment (ECF No. 20) is denied; and

3. This matter is remanded for further proceedings consistent with this order.

DATED: September 14, 2015

_____
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE